CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 408-5100
David M. LeMay (DL 9093)

Counsel to the Official Committee of
Unsecured Creditors of Parmalat USA Corp., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. |
| PARMALAT USA CORP., et al., | 04-11139 (RDD) |
| | (Jointly Administered) |
| Debtors. | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE MOTION OF FRIENDSHIP DAIRIES, INC. AND PERRY'S ICE CREAM COMPANY, INC. FOR APPOINTMENT OF AN EXAMINER**

The Official Committee of Unsecured Creditors (the "Committee") of Parmalat USA Corp., et al., as debtors in possession, (the "Debtors") submits this objection to the Motion of Friendship Dairies, Inc. and Perry's Ice Cream Company, Inc. (the "Movants") For Appointment of an Examiner (the "Motion").

## BACKGROUND

1. On May 7, 2004, without any prior consultation with the Committee, the Debtors or, to the best of the Committee's knowledge, the United States Trustee, and without taking any steps to ascertain what investigations are already in progress or planned, counsel for the Movants filed the Motion.

2.    The Motion seeks appointment of an examiner to perform a broad and expansive investigation. The Movants request the appointment of an examiner to "investigate the Parmalat collapse, its causes and history, and how the pre-2004 affairs of Parmalat may have involved transactions designed to strip assets from the Debtors . . . any potential mismanagement of the Debtors prior to 2004, including possible interference with the U.S. management by other Parmalat group companies' officer or directors . . . if the apparent improprieties throughout the Parmalat group may have involved the Debtors, their assets or their management, and how these alleged misdeeds may have damaged the Debtors' estates and creditors . . . protect any documents or other evidence which may still exist concerning these matters as well as a mandate to investigate how and if, at any time, any person improperly sought to destroy any such evidence or otherwise cover-up the misdeeds and improprieties that allegedly plagued Parmalat's (and, possibly, the Debtors') history." Motion at ¶ 5. Essentially, the Movants request a sweeping worldwide investigation of the entire Parmalat empire. Such a project would either duplicate work already being done by the Committee or would waste estate resources on the transatlantic pursuit of entities either already in Italian insolvency proceedings or likely to become so. The relief requested is unnecessary and duplicative, and would burden the Debtors' estates and creditors.

**PRELIMINARY STATEMENT**

3.    The appointment of an examiner would plainly not be in the best interests of the estates' creditors. And the requirements of section 1104(c)(2) of the Bankruptcy Code — dealing with the so called "mandatory" appointment of an examiner — are not met with respect to the two operating companies of the Debtors. The remaining Debtor is an illiquid holding

2

company with no source of funds to pay for an examination. The Committee, and not a self-serving professional trying to create a role for himself, is best positioned and motivated to investigate the Debtors' affairs in an efficient, cost-effective manner. One of the core statutory powers of a creditors committee is precisely to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan." See 11 U.S.C. § 1103(c). The Committee is ready, willing and able to conduct any investigations that are necessary or desirable. The Committee intends to be a prudent steward of estate funds, however, and will do these investigations in a focused, cost-effective manner. The Committee has already begun its investigation of intercompany claims and the Committee's special conflicts counsel is deeply involved in its investigation of potential claims against Citigroup, Inc. ("Citigroup") and General Electric Capital Corporation ("GECC"), the Debtors' pre- and post-petition lenders. The Movants do not even suggest that the Committee is failing to proceed with vigor or speed on any of these initiatives.

**OBJECTION**

**I.     There is No Basis for the Mandatory Appointment
of an Examiner Under Section 1104(c)(2) of the Bankruptcy Code**

4. Pursuant to section 1104(c)(2) of the Bankruptcy Code, an examiner shall be appointed upon the request of a party in interest if "the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000." The only debtor in these cases that could even arguably satisfy this requirement is Parmalat USA Corp. ("Parmalat USA"). Although Parmalat USA apparently has over $5,000,000 of non-insider, non-trade, unsecured claims, no holder of those types of claims has

3

asked for an examiner — the Movants' claims are purely trade claims, and in any case, it appears they may not be properly assertable against Parmalat USA (see below).  Parmalat USA's Schedules of Assets and Liabilities ("Schedules"), filed on April 23, 2004, indicate that Comerica Bank, Banca di Roma and Banca Intesa SpA are owed approximately $20 million in unsecured bank debt.  However, it is also clear from the Schedules and Statement of Financial Affairs that Parmalat USA is a holding company with no assets other than possible causes of action and its direct equity interest in Farmland Dairies, LLC ("Farmland) and its indirect interest in Milk Products of Alabama, LLC ("Milk Products").

       5.    Parmalat USA has no cash or other liquid assets with which to pay professional fees and no access to the Debtors' post-petition financing facility (the "DIP Loan Facility") for the purpose of funding an examination.  Pursuant to the Final Order (1) Authorizing Debtors-in-Possession to Enter into Post-Petition Financing Agreement and Obtain Post-Petition Financing; (2) Authorizing Debtors-in-Possession to Enter into an Amendment to Receivables Purchase Agreement and Sell Interests in Accounts Receivable; (3) Providing Adequate Protection; and (4) Granting Liens, Security Interests and Superpriority Claims for Both Transactions, entered by the Court on March 30, 2004 (the "DIP Final Order"), the Debtors are "authorized to borrow money, use Cash Collateral and spend money solely to pay the operating expenses of Farmland and Milk Products . . . pay Permitted Fee Expenses (excluding Permitted Fee Expenses incurred on behalf of Parmalat [USA] in excess of $25,000, and excluding any Permitted Fee Expenses to investigate or prosecute claims or causes of action on behalf of Parmalat [USA]."  DIP Final Order at ¶2.

6.   The DIP Loan Facility was structured in this manner in order to resolve an objection filed by Comerica Bank, one of the three unsecured bank creditors of Parmalat USA. Comerica Bank insisted that Parmalat USA should not be subject to any liens, claims, or obligations under the DIP Loan Facility.  In order to accommodate Comerica Bank's objection, the DIP Loan Facility frees Parmalat USA of any obligations thereunder, and correspondingly limits Parmalat USA's access to the DIP Loan Facility to $25,000, but excluding any fees or costs associated with the investigation or prosecution of claims on behalf of Parmalat USA. Because it would be deeply unfair to require the Farmland and Milk Products estates to underwrite the costs of an examiner at Parmalat USA, if an examiner were appointed for Parmalat USA, that examiner would have no funding for its activities.

7.   Despite the language of section 1104(c)(2) of the Bankruptcy Code, courts have reached different conclusions about its supposed mandatory nature. In re Bradlees Stores, Inc., 209 B.R. 36, 38-39 (Bankr. S.D.N.Y. 1997) (recognizing the split in authority).  Courts have denied appointment of an examiner, even when the circumstances set forth in section 1104(c)(2) were present, when the appointment would "entail undue delay in the administration of [the] estate and most likely cause the debtor to incur substantial and unnecessary costs and expenses detrimental to the interests of creditors and parties in interest." See, e.g., In re Shelter Resources Corp., 35 B.R. 304, 305 (Bankr. N.D. Ohio 1983).  The court's decision was influenced by the fact that there was a committee with section 1103(c) investigatory powers already in place and, therefore, the appointment of an examiner would be duplicative.  Id. See also In re Rutenberg, 158 B.R. 230, 233 (Bankr. M.D. Fla. 1993) (denying appointment of an examiner based on the totality of circumstances, including the delay an examination would

5

NY3 - 349942.03

cause). Although <u>Keene Corp</u>. v. <u>Coleman</u> (<u>In re Keene Corp</u>.), 164 B.R. 844, 856 n.9 (Bankr. S.D.N.Y. 1994) has questioned the continuing vitality of <u>Shelter Resources</u> given the Sixth Circuit's decision in <u>Morgenstern</u> v. <u>Revco D.S., Inc</u>. (<u>In re Revco D.S. Inc</u>.), 898 F.2d 498, 500-01 (6th Cir. 1990) that appointment of an examiner is mandatory under section 1104(c)(2) of the Bankruptcy Code, no court in the Second Circuit has definitively resolved the split of authority on the issue of the mandatory nature of section 1104(c)(2), and <u>Shelter Resources</u> therefore remains good law. <u>In re Bradlees Stores, Inc</u>., 209 B.R. at 39; <u>In re Keene Corp</u>. at 856.

8. The Schedules of Farmland and Milk Products show that those debtors do not have "fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, [that] exceed $5,000,000." Accordingly, the Movants clearly do not satisfy section 1104(c)(2) of the Bankruptcy Code as to Farmland and Milk Products. The Farmland and Milk Products estates cannot be burdened with the costs of an examiner that the vast majority of their creditors do not need or want solely because of the debt structure of Parmalat USA.

9. Additionally, as more fully examined in the Debtors' objection to the Motion, it appears that neither Friendship nor Perry's may actually be a creditor of Parmalat USA, the only debtor entity that arguably falls within section 1104(c)(2). Thus, the Movants may lack standing to move for appointment of an examiner at Parmalat USA because they are not parties

6

in interest as to Parmalat USA. The Committee respectfully refers the Court to the Debtors' submission on that issue[1].

## II.    The Movants Do Not Satisfy Section 1104(c)(1) of the Bankruptcy Code

10.   The Movants suggest that the interests of creditors warrant the appointment of an examiner under section 1104(c)(1) of the Bankruptcy Code. In the circumstances of this case, exactly the opposite is true.

### A. The Committee Is The Party Best Positioned And Motivated To Conduct Any Investigation

11.   The Committee has broad powers under section 1103 of the Bankruptcy Code. The Committee may, *inter alia*, "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan." 11 U.S.C. § 1103(c). The Committee may also perform such other services as are in the interest of those represented. 11 U.S.C. §1103(c). "The investigative authority granted to a committee is extremely broad and a committee may undertake whatever investigation is appropriate to enable it to fulfill its duty to monitor the operations of the debtor and participate in formulation of a plan." 7 Collier on Bankruptcy ¶ 1103.05 (15th ed. rev. 2003). See also Manville Corp. v. The Equity Security Holders' Committee (In re Johns-Manville Corp.), 60 B.R. 842, 853 n. 23 (S.D.N.Y. 1986) (citing In re Daig Corp., 17 B.R. 41, 43 (Bankr. D. Minn. 1981) ("The committee as the sum of its members is not intended to be merely an arbiter but a

---

[1]   The Committee agrees with, and hereby joins, all the legal arguments and assertions set forth

7

partisan which will aid, assist, and monitor the debtor . . . .")).  These investigative powers include the investigation of the Debtors' officers and management in order to determine if there has been pre-petition fraud, gross mismanagement, or insider dealings.  7 Collier on Bankruptcy at ¶ 1103.05.

12.  The Committee in this case takes these duties very seriously indeed and is currently engaged in an extensive and accelerated investigation of possible intercompany claims against the Debtors' various foreign affiliates (both in North America and elsewhere) as well as possible claims against GECC and Citigroup.  The Committee has launched its investigation and is working extensively with its financial advisors to gather information and document the amounts and bases for the Committee's claims against the Debtors' foreign affiliates.  Although Committee counsel has indicated to the Movants' counsel that it is initially pursuing more viable claims against the Debtors' solvent foreign affiliates so that it has a better chance of achieving a cost-effective recovery, the Committee is also considering claims against the Debtors' foreign affiliates (and their former management) in Italy and elsewhere.

13.  The Committee's special conflicts counsel has made significant progress with its discovery efforts in its review of issues concerning GECC and Citigroup.  The Committee's special conflicts counsel expects to be in a position soon to give a recommendation to the Committee regarding these potential claims.  In sum, the Committee has launched and is well underway with a focused and targeted investigation program designed to maximize unsecured creditor recovery in a cost-effective way.

---

in the Debtors' objection to the Motion.

NY3 - 349942.03

14. The Committee is working hard to ensure that the Debtors' assets, including their cash, businesses, property, books and records, and files are safeguarded and protected. The Committee is the entity that should be doing any investigation of the Debtors and their corporate affiliates. The Committee has the means, motives and incentives to conduct any needed investigation and is equipped with all the proper tools to do so — it has competent advisors and dedicated members with no conflicting interests.

### B. The Committee Has The Independence To Conduct Any Necessary Investigations

15. The Motion completely ignores the work being done by the Committee. The Committee's members and its advisors have no conflicts of interest and are able to undertake any investigative duties that are necessary in these cases. Indeed, the Movants have not alleged that the Committee or its members or advisors are disabled or conflicted in any manner, or that the Committee is in any way failing to do its job.

### C. The Motion Seeks Relief That Would Lead to Duplication of Efforts and a Drain on the Debtors' Estates

16. An examiner would inevitably duplicate the efforts of the Committee, and would waste estate resources and further complicate the Debtors' cases. There is absolutely no need to inject a new set of professionals in these cases. The Court should decline the invitation to needlessly duplicate the investigation with which the Committee has already made substantial progress.

### III. The Motion Was Not Filed In Good Faith But For Self-Serving Reasons

17. The Committee is extremely skeptical about the Movants' motives. It appears that the Movants filed this Motion to create an opportunity for their attorney to be appointed as

the examiner in these cases. Despite the fact that Committee professionals have spent time explaining to the Movants' attorney that claims against all of the Debtors' foreign affiliates are being considered (and will be pursued as appropriate) even though the Committee may pursue the most viable claims first, the Movants' attorney has made it clear that he would like to be the one pursuing claims against the Debtors' Italian affiliates. However, such attorney has failed to articulate any good faith reason why scarce estate assets should be used to retain his or any other new law firm to investigate claims that are already being pursued, other than stating that he speaks Italian and has relationships with Italian lawyers. The Court should decline the Movants' request for the estates to underwrite their attorney's trip to Italy. The Movants' actions are particularly perplexing given that the Movants have made no showing, or even alleged, that the Committee is acting slowly or failing to effectively perform its duty to investigate possible claims, including claims against the Debtors' foreign affiliates.

NY3 - 349942.03

WHEREFORE, the Committee requests that the Court (i) deny the Motion; and (ii) grant such other and further relief as the Court may deem necessary and proper.

Dated: New York, New York
May 17, 2004

        **OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF PARMALAT USA CORP., et al.,**

        **CHADBOURNE & PARKE LLP**

        By: */s/ David M. LeMay*

        David M. LeMay (DL 9093)
        30 Rockefeller Plaza
        New York, NY 10112
        (212) 408-5100

        Counsel to the Official Committee of Unsecured Creditors of Parmalat USA Corp., et al.